# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA   :
                                  :
    vs.                        :                CR No. 09-057-ML
                                  :
ERIC SNEAD                 :

## MEMORANDUM AND ORDER

Eric Snead has filed a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. He has also filed a motion to amend his motion to vacate, and an accompanying request for an evidentiary hearing. For the reasons that follow, all of these motions are DENIED.

## FACTUAL BACKGROUND AND TRAVEL

A.    <u>Offense Facts</u>[1]

The facts that were recited by the Government at Petitioner's change of plea hearing, and which formed the basis for the prosecution version included in the Presentence investigation report were as follows:

Between approximately October 2008 and April 2009, Eric Snead (Snead), along with his co-defendants Harry Gonzalez (Gonzalez), Norma Danzot (Danzot), Kenneth Muniz aka Kenneth Monroe (Monroe), Dwayne Silva (Silva), Jose Pereyra aka Carlos Ortiz (Pereyra), and others participated in a scheme to steal people's identities and use those identities to commit multiple acts of credit card fraud. Also involved as a participant was a confidential informant (CI) working at the direction of the Secret Service and equipped with an audio recording device.

---

[1] Except as otherwise noted, the facts recited herein are drawn largely from the Government's recitation of facts presented at Snead's change of plea hearing, as set forth in his Presentence Report (PSR) prepared by the U.S. Probation Office. (<u>See</u> PSR, ¶11 at 2-10.)

During the course of the scheme, Snead, with the help of his co-conspirators, obtained the identities of nearly fifty individuals and created temporary RI driver's licenses using the names of his victims and the pictures of his co-conspirators. Snead then contacted financial institutions, including Chase, Citibank, and Bank of America, where his victims had credit card accounts and obtained unauthorized credit cards for those accounts. Snead and his co-conspirators then used the unauthorized credit cards to obtain cash, goods, and services in an amount of over $400,000.

Snead purchased the personal identifying information of numerous individuals from various sources, including contacts at businesses such as Versatile Marketing Solutions, Metro Honda, mortgage brokers, cell phone kiosks, or from associates. The personal identifying information often included the name, address, social security number, date of birth, and phone number of the victim. Once he had this information, Snead would log onto credit reporting websites such as www.freecreditreport.com and request a credit report for these individuals. If Snead determined that the potential victims had credit cards with significant credit limits, he would contact the various financial institutions, pose as the account holder, and order duplicate credit cards. Snead directed the financial institutions to send the duplicate cards via Federal Express or UPS so that the shipment could be traced and intercepted by his associates.

After ordering the credit cards, Snead used one of his computers, a thumb-drive device, and scanner to merge the name of the victim, a photograph of a co-conspirator, a fake date of birth, a transaction date, an expiration date, a driver's license number, and address information, and an image of the official State of Rhode Island Seal, onto a template of a Rhode Island temporary driver's license. The result was an authentic-looking temporary Rhode Island driver's license bearing the name and address of the victim of the identity theft, the photograph of a co-conspirator, and other fictitious information.

Snead then directed his co-conspirators to intercept the credit cards either outside the victim's

house, at a Federal Express or UPS holding facility (at which the identification document was essential), or at another address provided to the bank. Once the credit card was secured, Snead would direct his co-conspirators to go to nearby casinos (usually either Foxwoods or Mohegan Sun) or to AAA stores in Connecticut, Rhode Island, and Massachusetts and obtain a cash advance on the credit cards. Snead also directed his co-conspirators to go to various stores and purchase televisions, computers, cell phones, and other electronics which he and his co-conspirators later sold to various individuals on the street. Usually, Gonzalez, Danzot and others, and runners hired by them, carried out the fraudulent transactions. Once the co-conspirators obtained the cash or goods that were purchased using the fraudulent credit cards, they brought them back to Snead's business, the Purple City Salon, or his home. The proceeds were divided among the co-conspirators based on their role in that particular transaction. Generally the coconspirators received from $500 to $2,500 per transaction as well as various goods and services which they purchased for themselves using the unauthorized credit cards. Snead also used the fraudulent cards to purchase airline tickets and to make other online purchases. In addition to fraudulent transactions at the Connecticut casinos, the credit cards were also used to obtain travelers checks at AAA or American Express travel stores. The checks were then cashed at casinos in Atlantic City or Las Vegas.

Many of the fraudulent transactions that were committed by Snead over the course of the conspiracy and charged in the Indictment were described with particularity in the prosecution's recitation of facts in the PSR and at the plea hearing. In each of those instances, Snead's home, cellular telephone, laptop, or thumb drive contained direct evidence linking him to the fraudulent transactions. Additionally, statements obtained from Danzot and Gonzalez further corroborated that Snead provided them with the information, instructions, false driver's licenses, and funds necessary to carry out the conspiracy. Specific fraudulent transactions or schemes orchestrated by Snead included the following:

On or about February 3, 2009, the CI met Snead at his third floor apartment on Arch Street. During the recorded conversation, the CI and Snead could be heard talking about the information contained in credit reports and how those numbers were used by Snead. Snead refused to explain the process to the CI stating that he didn't want to give out the "key" because it could get too hot for him. As he was leaving, the CI handed Snead several customer applications from a business called Versatile Marketing Solutions. The two could be heard discussing the credit scores that were indicated on the "leads."

On February 9, 2009, Snead, Gonzalez, Monroe, Danzot, and Samir Aliyev went to Best Buy in Seekonk, MA (as well as other stores on Route 6) in order to purchase cell phones. Danzot was arrested at the Best Buy by the Seekonk police for being in possession of a temporary license in the name of Tiffany McGee. A file with Tiffany McGee's signature was found on Snead's thumb drive. Between February 9, 2009, and March 31, 2009, the CI had numerous recorded conversations with Snead in furtherance of the conspiracy. The CI's interactions with Snead and the others were continually monitored by law enforcement agents.[2]

On March 31, 2009, the CI placed a recorded and monitored phone call to Snead in which the CI informed Snead that he had a contact at the DMV who could produce "real fake" driver licenses for Snead. Snead suggested that the CI and Gonzalez meet this contact. Snead indicated that he didn't want to go himself because he didn't want to be seen.

Following this call, the CI, equipped with an audio recording device, drove to Snead's apartment on Arch Street where he met Snead and Gonzalez. The CI and Gonzalez drove to Warwick Mall where they met with an undercover agent (UC) posing as a DMV clerk. The meeting was recorded. During the

---

[2]    An extensive description of the CI's specific interactions with Snead, many of which were recorded via audio and/or video, is set forth in the Government's memorandum of law in support of its objection to Petitioner's motion to vacate (Doc. #118) (Govt. Mem.) at 7-15 and PSR, ¶11at 2-9.

meeting, Gonzalez and the UC agreed that the UC would produce two driver's licenses at $500 each. During the conversation Gonzalez stated that he and "his partner" anticipated doing a lot of business with the UC.

Following this meeting, the CI and Gonzalez drove back to Purple City Salon where they met with Snead to discuss what had just transpired. The CI was still equipped with an audio recording device. Snead revealed that had two clear victims lined up, Ruben Garces and James Marrone. Snead discussed how Marrone, an investment banker in New York, would be his "million dollar line" and stated that he planned to make a withdrawal of over $150,000 from Marrone's bank account. Evidence obtained from Free Credit Report and from American Express showed that there were checks on Marrone's credit performed from Snead's computers.

Later on March 31, 2009, the UC and Gonzalez engaged in a series of recorded telephone calls in which Gonzalez gave the UC the personal identifying information of the two intended victims: James Marrone and Ruben Garces. Gonzalez also indicated that his own photo would be used in conjunction with the Marrone license and the photo of one Ismael Figueroa would be used with the Ruben Garces license.

On April 2, 2009, the date of Snead's arrest, Snead and the CI engaged in a number of monitored and recorded phone calls during which Snead discussed obtaining the fake licenses. That afternoon, the CI delivered the licenses to Snead and Gonzalez at Arch Street, Providence, Rhode Island. The CI was wired with a pin camera which recorded Snead and Gonzalez examining the fake licenses as they were standing on the stoop of Snead's residence on Arch Street.

Immediately thereafter, law enforcement agents converged on Arch Street. As agents approached, Snead fled into the building. He was seen throwing one of the fake licenses as he was running up the stairs. Snead ran through his apartment, out through the back stairs, and into his mother's apartment on

the second floor where he was apprehended. The license in the name of Ruben Garces was retrieved from the second story landing inside the Arch Street apartment. The license in the name of James Marrone and $3500 were seized from Snead upon his arrest.

Also on April 2, 2009, Special Agent Caroline O'Brien applied for and obtained a search warrant for Snead's home on the third floor of a residence on Arch Street, Providence, Rhode Island, and the basement of Purple City Salon, 244 Broad Street, Providence, Rhode Island ("244 Broad Street"). The search warrant application included a 25-page affidavit detailing the actions of Snead and his co-conspirators in connection with their fraudulent schemes to obtain/create and use false credit cards in the names of unsuspecting victims. Later that day, Secret Service agents, aided by the Rhode Island State Police and local law enforcement, executed the search warrant at the Arch Street apartment. The agents seized numerous items of evidence, including but not limited to: a "lead" for James Marrone from Versatile Marketing Solutions, several "leads" from Metro Honda, three laptop computers, a thumb drive, other computer related hardware, currency and gift cards, and other documents evidencing Snead's residence at that location. The laptop computers and thumb-drive were later analyzed by a forensic examiner for the Secret Service and were found to contain numerous files linking Snead to the conspiracy, including, but not limited to, images of fraudulent Rhode Island temporary driver licenses, temporary internet files containing MapQuest directions to various victims' homes, and files demonstrating repeated searches on credit reporting websites.

After he was taken into custody, Snead was advised of his Miranda rights verbally and in writing. Snead agreed to speak to the agents and admitted his involvement in the scheme. He also admitted creating the identification documents and ordering the credit cards.

B.    <u>Procedural History</u>

1.    The Indictment

On April 29, 2009, a federal grand jury returned a 32-Count Indictment against Snead, and co-defendants Gonzalez, Danzot, and Monroe, charging them with various offenses related to the above-described scheme.  The Indictment charged Snead with conspiracy to knowingly and without lawful authority produce one or more false identification documents, in violation of 18 U.S.C. §1028(a)(1), knowingly possessing with intent to use and transfer unlawfully five or more identification documents, in violation of 18 U.S.C. § 1028(a)(3), knowingly transferring, possessing, and using, a means of identification of another person with intent to commit, and aiding and abetting the commission of a violation of federal law, in violation of 18 U.S.C. § 1028(a)(7), and with trafficking in unauthorized access devices in violation of 18 U.S.C. § 1029(a)(2), in violation of 18 U.S.C. §371 (Count I).  The Indictment also charged Snead with eleven counts of unauthorized use of an access device, in violation of 18 U.S.C. §1029(a)(2), nine counts of unlawful production of an identification document or authentication feature, in violation of 18 U.S.C. §§ 1028(a)(1) and  (b)(1)(A), one count of possession with intent to use or transfer five or more identification documents, in violation of 18 U.S.C. §§ 1028(a)(3) and (b)(1)(A), one count of possession of a document-making implement and authentication feature, in violation of 18 U.S.C. §§ 1028(a)(5) and (b)(1)(A), and nine counts of aggravated identity theft in violation of 18 U.S.C. §§1028A(a)(1) and (c)(4) (Counts VIII-XI).

After being initially represented by Attorney Joseph J. Voccola, Snead was represented by retained counsel, Attorney Jeffrey Pine,  from arraignment through plea proceedings in this Court.  Thereafter, Snead was represented by Attorney David Cooper for sentencing proceedings.

2.    The Hearing on Suppression Motions

On August 19, 2009, Snead, through his counsel, filed an extensive Motion to Suppress Statements

and Evidence (Doc. #41) as well as a motion for a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) (Doc. #42) and related motions to compel disclosure of the CI's identity and exculpatory evidence (Docs. ## 38-40). The Government filed its response to the motions (Doc. #48) and a supplemental response (Doc. #55). Thereafter, Snead filed a supplemental memorandum in support of the Motion to Suppress (Doc. #56).

In his motions Snead vigorously challenged the accuracy of the search warrant affidavit. He asserted that the Affidavit did not sufficiently disclose the CI's criminal history, disputed the Affidavit's description of certain meetings between Snead and the CI, and pointed out errors regarding IP addresses and subscriber information in the Affidavit. The motions also asserted that the Affidavit in support of the search warrant lacked particularity and there was an insufficient nexus between the criminal activity and the Arch Street apartment. Snead raises many of these complaints again in his 2255 filings. In its response, the Government disputed most of Snead's claims but did concede several minor errors in the 25-page search warrant Affidavit.[3]

At the hearing on the foregoing motions, held on October 7, 2009, defense counsel conceded that the motion for disclosure of the identity of the CI, the motion for promises, rewards, and inducements, and the motion for exculpatory evidence were all moot as the Government had substantially complied with

---

[3] These errors included: (1) Snead's name was not on the electricity bills for Arch Street (however National Grid documents also showed that Snead requested that the bill be sent to his business address, Purple City, 244 Broad Street, Providence, RI); (2) Treakle's account was accessed not through freecreditreport.com but through American Express; (3) there was no record support for the statement that Sandstrom's credit report was obtained from freecreditrerport.com using the IP address of 244 Broad Street; and (4) the March 31, 2009 meeting between Snead, Gonzalez and the CI that followed the meeting with the UC who sold Gonzalez fake driver's licenses, took place at Snead's business, 244 Broad Street, and not at his Arch Street apartment. (<u>See</u> Govt' Mem. at 17.)

Snead's requests for that information.[4]  (See Transcript of Motions Hearing conducted on October 7, 2009 [Suppression Motion Tr.] at 2-3.)  As to the motion to suppress and motion for a Franks hearing, this Court noted that even if it accepted Snead's assertions in those motions concerning the errors in the search warrant application, there was sufficient evidence remaining to establish probable cause for the issuance of the search warrants.  Thus, the Court found there was no need for an evidentiary hearing and denied both motions. (Id. at 8-10.)

3.     The Change of Plea Hearing and Sentencing.

On October 15, 2009, after jury selection had been completed, Snead signed a plea agreement and agreed to plead guilty.  The plea agreement provided that in exchange for Snead's plea of guilty to all counts of the Indictment, the Government agreed to recommend a term of imprisonment within the guidelines range as determined by this Court. (Plea Agreement, ¶2.) The Agreement also contained stipulations as to (1) the number of victims (more than 10 and less than 50), and (2) the loss amount (between $200,000 - $400,000)  but reserved the parties' rights to argue the applicability of any other guidelines enhancements, such as role in the offense.  (Id., ¶4.)  The agreement also provided that Snead waived his right to appeal if he received a sentence within or below the applicable guidelines range.  (Id., ¶12.)

At the change of plea hearing, this Court extensively questioned Snead before accepting his plea.  Snead was advised of all the rights he was giving up by pleading guilty, including his right of appeal.  The Government recited the facts set forth above and Snead agreed to those facts and admitted his guilt.  Shortly after the change of plea hearing, Attorney Pine withdrew as counsel for Snead and Attorney Cooper

---

[4]     Indeed, Snead's motion papers show that he had in his possession substantial information relating to the Government's case, including the identity of the CI, notwithstanding this Court's Protective Order.

appeared and represented Snead throughout his sentencing proceedings.

The PSR calculated a guidelines range of 92 to 115 months, based on an offense level of 23 and criminal history category of VI. (PSR, ¶¶19-29.) The offense level was based in part on (1) the loss amount attributable to Snead; (2) the number of victims; (3) the sophisticated means used by Snead to accomplish his crimes; and (4) his role as an organizer/leader in a criminal activity involving at least 5 participants as well as a 3-point reduction for acceptance of responsibility, notwithstanding that Snead did not plead until the eve of trial. (Id.) In addition to setting the guidelines range, the PSR also found that Snead was subject to a consecutive two-year sentence for aggravated identity theft. (Id., ¶ 30.)

The sentencing hearing was held on January 29, 2010. Snead did not submit objections to the PSR. After hearing from the Government, defense counsel, and Snead, this Court imposed a sentence of 60 months imprisonment on Count I, and 108 months imprisonment on Counts II through XXIII, to run concurrently with the sentence on Count I. This Court imposed a consecutive term of 24 months on counts XXIV - XXXII of the Indictment. This Court also ordered restitution in the amount of $350,916.55, for which Snead was jointly and severally liable with his co-defendants.

Some three weeks following Snead's sentencing hearing, two additional financial institutions, Citigroup Investigative Services and Chase Bank, submitted letters seeking restitution and claiming losses of $29,245.27 and $89,819.07, respectively. The Government filed a motion to include these amounts in the restitution owed, to which Snead objected. On May 10, 2010, this Court amended the restitution amount, which increased the total restitution to $469,980.89. This increased restitution was also imposed on Snead's co-defendants. An Amended Judgment was entered on May 10, 2010. See Amended Judgment (Doc. #87).[5]

---

[5] Although this amount reflected a loss greater than $400,000, thereby potentially subjecting Snead to a higher guidelines range, Snead's sentence was not amended in any other way.

4.      Snead's Appeal

On May 25, 2010, Snead submitted a letter to the First Circuit Court of Appeals inquiring about the status of his appeal. On June 23, 2010, the court responded that no appeal had been filed, and construed Snead's letter as a notice of appeal. The Court's letter fully apprised Snead of his options in pursuing an appeal. (See Govt. Mem., Exh. 1.)

On June 24, 2010, an Order of Default was entered in the First Circuit due to Snead's failure to pay the filing fee. See United States v. Eric Snead, No. 10-1649, Order of Default (1st Cir. June 24, 2010). The Court of Appeals informed Snead of his option to proceed *in forma pauperis.* On June 28, 2010, Attorney Cooper moved to withdraw as counsel for Snead, asserting (1) that Snead had been advised of his rights and agreed to not take an appeal, but (2) that Snead had since changed his mind; and (3) that counsel had not been retained to handle the appeal. (See Govt. Mem., Exh. 3.) At the request of the First Circuit, Attorney Cooper filed letters he had sent to Snead on June 24, June 29, July 6, July 12, and August 19, 2010. (See id., Exh. 4.) The letters clearly reflected: (1) that Attorney Cooper was initially under the impression that Snead did not wish to pursue an appeal; (2) that counsel then learned that Snead did wish to pursue an appeal; (3) that counsel advised Snead than an appeal would be frivolous because his objections to the suppression ruling were extinguished as a result of his guilty plea and because he waived his right to appeal; and (4) that counsel advised Snead that if he still wished to pursue an appeal he would have to do so *in forma pauperis*.

On August 6, 2010, Snead filed a letter with the First Circuit requesting that his appeal be dismissed. On September 13, 2010, the First Circuit denied this request and informed Snead that his "assumption that his appeal is untimely may be mistaken," thus suggesting to Snead that he could continue his appeal. (Govt. Mem., Exh. 5.)

On September 24, 2010, Snead filed a motion to proceed *in forma pauperis*. On September 30, 2010, the First Circuit denied the request without prejudice and instructed Snead that he must first file the motion, along with a Financial Affidavit, with this Court. (Id., Exh. 6.) A review of the docket in this matter indicates that Snead never filed a motion to proceed *in forma pauperis*. On December 14, 2010, after sending the First Circuit multiple letters, Snead filed a motion to dismiss his Appeal. Again, the First Circuit denied the Motion and advised Snead of the consequences of dismissing his appeal. (Id., Exh. 7.) On January 10, 2011, Snead renewed his motion to dismiss, indicating that he wished to pursue his §2255 petition in this Court. The First Circuit granted that motion on January 20, 2011. See Snead, No. 10-1649, Judgment (1st Cir. Jan.20, 2011).

Snead thereafter filed the instant § 2255 motion to vacate.[6] In his motion Snead asserts six ineffective assistance claims and one claim of prosecutorial misconduct due to alleged Brady violations. His claims of ineffective assistance assert that his counsel: (1) failed to file an appeal of the denial of the suppression hearing and Franks hearing; (2) failed to object to the PSR; (3) failed to appeal sentencing disparity between his sentence and the sentence of his co-defendants; (4) failed to investigate and present material evidence; (5) failed to move for the recusal of the trial judge; (6) and failed to obtain certain evidence favorable to Snead. Snead submitted two supplemental filings in support of his motion (Docs. ##111, 113.)

The Government filed an objection to the motion to vacate (Doc. #118). Snead then filed a reply (Doc. #120) and a further supplemental memorandum, along with a supporting exhibit. (Docs. ##121,

---

[6] A previous motion to vacate, filed by Snead while his direct appeal was still pending, was denied without prejudice as premature. (See Order entered Oct. 8, 2010) (Doc. #101). Snead's motion to recuse the undersigned was also denied by this Court. (See Text Order entered August 12, 2010.)

122.)[7]  This matter is ready for decision.[8]

## DISCUSSION

Generally, the grounds justifying relief under 28 U.S.C. § 2255 are limited. [9]  A court may grant

such relief only if it finds a lack of jurisdiction, constitutional error, or a fundamental error of law.  See

United States v. Addonizio, 442 U.S. 178, 184-185 (1979) ("An error of law does not provide a basis for

collateral attack unless the claimed error constituted a fundamental defect which inherently results in a

complete miscarriage of justice.").

This Court first addresses Snead's ineffective assistance claims and will then discuss, to the extent

necessary, Snead's prosecutorial misconduct claim.  None of these claims have merit.

A.    Ineffective Assistance Claims

A defendant who claims that he was deprived of his Sixth Amendment right to effective

---

[7]    In all, Snead has submitted nearly 300 pages of motions, memoranda, affidavits, and exhibits in support of his motion to vacate.  This Court notes that these voluminous filings -- many of which reiterate arguments asserted unsuccessfully by his counsel in the underlying criminal proceeding -- do not bolster his claims.

[8]    Although Snead seeks an evidentiary hearing on his claims, no hearing is required in connection with any issues raised by his motion to vacate, because, as discussed infra, the files and records of this case conclusively establish that the claims in the motion to vacate are without merit.  See David v. United States, 134 F.3d 470, 477 (1st Cir. 1998) (district court properly may forego any hearing "when (1) the motion is inadequate on its face, or (2) the movant's allegations, even if true, do not entitle him to relief, or (3) the movant's allegations need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible.") (internal quotations omitted).  See also Panzardi-Alvarez v. United States, 879 F.2d 975, 985 n.8 (1st Cir. 1989) (no hearing is required where district judge is familiar with underlying criminal case).

[9]  Title 28 U.S.C. § 2255 provides in pertinent part:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence is in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. §2255(a).

assistance of counsel must demonstrate:

(1)     That his counsel's performance fell below an objective standard of reasonableness; and

(2)     [A] reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984). See United States v. Manon, 608 F.3d 126 (1st Cir. 2010) (same).

To satisfy the deficient-performance prong, the defendant "'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' and the court then determines whether, in the particular context, the identified conduct or inaction was 'outside the wide range of professionally competent assistance.'" Manon, 608 F.3d at131 (quoting Strickland, 466 U.S. at 690). Counsel's performance is accorded deferential review and should not be assessed based on hindsight. Strickland, 466 U.S. at 690-92. See Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993) (same). To satisfy the prejudice requirement under Strickland, a defendant must show a reasonable probability that, but for counsel's errors, the outcome of the trial would have been different. United States v. Theodore, 468 F.3d 52, 56 (1st Cir. 2006) (citing Strickland, 466 U.S. at 695).

Snead's ineffective assistance claims can be grouped according to which counsel represented Snead in the proceeding from which the claim stems.

1.      Failure to Appeal

Snead's first ground in support of his 2255 petition is that his counsel failed to file a timely notice of appeal from the denial of the motion to suppress and motion for Franks hearing. (Motion to Vacate, ¶13; Pet. Mem. at 16.)[10] In support of this ground, Snead recounts conversations with Attorney Pine in

---

[10]     In Ground One of his motion to vacate, Snead alleges that his counsel (presumably Attorney Cooper) failed to appeal from the Amended Judgment based upon "erroneous information," presumably referring to the additional two claims for restitution that were received after the entry of Snead's original Judgment. Even assuming the truth of these assertions and that either counsel's performance could

which he was led to expect that he would receive an evidentiary hearing. While that may have been his expectation, the law governing evidentiary hearings on Franks motions is clear. Where, as here, Snead failed to satisfy the three prongs of the Franks analysis, no hearing is warranted. See Franks v. Delaware, 438 U.S. 154, 171 (1978); United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002) (citing Franks, 438 U.S. at 155–56); see also United States v. Southard, 700 F.2d 1, 8 (1st Cir.), cert. denied, 464 U.S. 823 (1983). Furthermore, the Franks requirement cannot be satisfied by an allegation that the informant relayed misinformation or even lied to the affiant. See United States v. Tzannos, 460 F.3d 128, 138 (1st Cir. 2006).

The law is clear that a defendant is not entitled to an interlocutory appeal from the denial of a motion to suppress. See Midland Asphalt Corp. v. United States, 489 U.S. 794 (1989) (interlocutory appeals in criminal cases have been limited to the denial of three types of motions, none of which are applicable here); United States v. Ryan, 402 U.S. 530, 533 (1971) (motion to quash); DiBella v. United States, 369 U.S. 121 (1962) (motion to suppress). Accordingly, there was no deficiency on the part of Attorney Pine in not filing an interlocutory appeal of the denial of the Motion to Suppress.

Similarly, there was no deficiency on the part of Attorney Cooper in failing to appeal the suppression ruling. In Roe v. Flores-Ortega, 528 U.S. 470 (2000), the Supreme Court noted that the relevant question in determining whether counsel's failure to file a notice of appeal constituted ineffective assistance is "whether counsel in fact consulted with the defendant about an appeal," and, if not, "whether counsel's failure to consult with the defendant itself constitutes deficient performance." Id. at 478. In making this determination, the Supreme Court has instructed the lower courts to look at all the attending

---

somehow have been deemed deficient, Snead suffered no prejudice, as the record shows that Snead was able to lodge a timely appeal but then subsequently decided on his own to voluntarily dismiss it. See Smith v. Robbins, 528 U.S.259 (2000) (applying 2-prong Strickland test to ineffective assistance claims against appellate counsel).

circumstances including whether the sentence followed a guilty plea or a trial, whether the sentence imposed was one that was bargained for as part of the plea, whether the plea agreement waived any or all appeal rights, and whether there were any non-frivolous grounds for appeal. Id. at 480.

A review of all of these factors leads to the conclusion that there was no ineffective assistance. First, there is direct evidence in the record that Attorney Cooper consulted with Snead regarding his right to appeal, advised him of the fact that an appeal was unlikely to succeed, and then further advised him regarding what steps Snead should take if he wanted the Court to appoint appellate counsel for him and how he could proceed *in forma pauperis*. Cooper filed his correspondence with Snead as Exhibits with the First Circuit. See Govt. Mem., Exh. 4 (Letters from Mr. Cooper to Snead dated June 24, June 29, July 6, July 12, and August 19, 2010) .

Second, Snead pled guilty, was sentenced to a term of imprisonment within the applicable guidelines range based on factors (e.g., the number of victims and the loss amount in the plea agreement) which were stipulated in the plea agreement (Plea Agreement, ¶4). Snead did not object to the PSR which relied on those stipulations. Under the terms of the plea agreement, he also waived his right to appeal. (Id., ¶12.) This Court informed Snead of his appellate waiver both at the change of plea hearing and at the sentencing hearing.

Third, Mr. Cooper's conclusion that there were no non-frivolous grounds for appeal was reasonable and he communicated that conclusion to Snead. (See Govt. Mem., Exh. 4, Cooper letter dated June 24, 2010.). It is well-settled that "an unconditional guilty plea insulates virtually all earlier rulings in the case from appellate review." United States v. Cordero, 42 F.3d 697, 698 (1st Cir. 1994) (citing Tollett v. Henderson, 411 U.S. 258, 267 (1973)). In Cordero, the First Circuit specifically considered defendant's wish to appeal the denial of a suppression motion following his plea of guilty. The First Circuit held that "the suppression ruling, even if erroneous, cannot be termed 'jurisdictional' in any

meaningful sense of the word," because a "jurisdictional defect is one that calls into doubt a court's power to entertain a matter, not one that merely calls into doubt the sufficiency or quantum of proof relating to guilt." Id. at 699. Here, it is evident that Attorney Cooper was well aware of this restriction, as he repeatedly advised Snead of it.

Even if Attorney Cooper was somehow deficient in failing to file a notice of appeal on behalf of his client, Snead cannot satisfy the prejudice prong of the Strickland analysis. See Flores-Ortega, 528 U.S. at 484 ("to show prejudice in these circumstances, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed"). Here, the record shows that Snead (1) filed a notice of appeal, (2) was provided with repeated opportunities to press his appeal, (3) was provided with instructions and forms by the First Circuit on how to press his appeal, and (4) was provided with multiple extensions of time within which to pursue the appeal.[11] Nevertheless, Snead knowingly and voluntarily opted to dismiss his appeal and to proceed with the 2255 petition. (See Govt Mem., Exhibits 1 -8.) Thereafter, Snead filed a second motion to dismiss his appeal indicating that he would prefer to press his 2255 petition. On January 20, 2011, the Court of Appeals granted that motion. Thus the record belies any claim by Snead that "but for counsel's deficient failure to consult . . . he would have timely appealed." Flores-Ortega, 528 U.S. at 277.

2.     Motion to Suppress

---

[11]     The Court of Appeals Order of December 28, 2010, is particularly compelling:

"With respect to defendant's pro se motion to dismiss his appeal, defendant is advised that if he dismisses his appeal, he will thereby waive any right he may have to appellate review of his conviction and sentence. As it is not clear whether defendant understands the consequences of his motion to dismiss, the motion is denied, without prejudice to renewal. Unless within four weeks of the date of this order defendant either (1) pays the $455.00 filing fee or (2) files in the district court . . . a motion to proceed in forma pauperis on appeal and properly completed financial affidavit, this appeal will be dismissed for lack of prosecution."

Snead, No. 10-1649, Order (1st Cir. Dec. 28, 2010)

Snead further claims that his counsel's performance in litigating that motion was deficient. (Motion to Vacate, Ground Four) This claim fails for several reasons.

First, as noted above, due to the fact that Snead voluntarily dismissed his appeal, and therefore never raised any of these objections with the First Circuit, he cannot raise them now for the first time. See, e.g., Coleman v. Thompson, 501 U.S. 722, 750 (1991) (failure to raise a constitutional issue on direct appeal, such as a Fourth Amendment claim, will bar raising the issue on collateral attack unless the Petitioner can demonstrate cause and prejudice); Knight v. United States, 37 F.3d 769, 774 (1st Cir. 1994) (same).[12]

Second, even if Snead is not precluded from challenging his counsel's performance at the suppression stage, his claim is meritless. This Court has recognized that "[w]here 'defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness,' a petitioner must also demonstrate 'that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the outcome would have been different absent the excludable evidence.'" United States v. Jimenez, 2010 WL 5092808 at *3 (D.R.I. 2010) (Smith, J.) (citing Kimmelman v. Morrison, 477 U.S. 365, 375 (1986)).

A defendant seeking a Franks hearing must make a "'substantial preliminary showing' that (1) a false statement, (2) knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit, and (3) the allegedly false statement [wa]s necessary to the finding of probable cause." United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002) (citing Franks, 438 U.S. at 171-72).

---

[12] While the First Circuit has not directly addressed the issue of whether a defendant's guilty plea waives a future collateral challenge based on ineffective assistance of counsel unrelated to the decision to plead guilty, this Court has recently found persuasive other court decisions that have barred such claims. See Jimenez, 2010 WL 5092808 at *3 (citing Moran v. Godinez, 57 F.3d 690, 700 (9th Cir. 1994), and United States v. Coffin, 76 F.3d 494, 498 (2d Cir. 1996), for the proposition that Tollet bars consideration in collateral proceedings of pre-plea ineffective assistance of counsel claims.)

Here, this Court found that even setting the disputed material aside, Agent O'Brien's Affidavit set forth an ample basis to establish probable cause in support of the search warrant for Snead's Arch Street apartment. That ruling was clearly supported by the evidence. Even without the disputed information, the warrant affidavit contained ample evidence (supported by video and audio recordings) of two criminal meetings inside Snead's residence during the two months prior to the search warrant. The CI's interactions with Snead and other members of the conspiracy were continually monitored and included numerous meetings, discussions of credit card schemes and victims, and the evidence on Snead's computer. These meetings showed a sufficient nexus between the alleged criminal activity and Snead's residence. See United States v. Bucuvalas, 970 F.2d 937, 941 (1st Cir. 1992) ("circumstantial evidence alone may establish probable cause").

Further, this Court recalls that Attorney Pine vigorously presented Snead's arguments in his suppression and Franks motions.[13] Here, Snead merely repeats these arguments. The factual record on which Snead relies was well known to the Court at the time the motion was argued. Snead offers no new evidence (other than unsupported allegations) nor does he posit any novel theories of suppression. While counsel was ultimately not successful, that in no way renders his performance deficient. See Strickland, at 689-90 (so long as a strategy or tactic employed by counsel was reasonable, that tactic is not ground for attack even if it proved unsuccessful); Campusano v. United States, 2004 WL 1824112 (S.D.N.Y. August 13, 2004 ) ("The fact that an attorney lost a particular argument cannot be used as a barometer of overall poor performance.").

For the foregoing, reasons, this claim fails.

---

[13]    Attorney Pine raised the issue of the CI's credibility; he brought to the Court's attention errors in the search warrant application affidavit; he argued that the information in that Affidavit was stale; he argued that the Affidavit lacked particularity; and he argued that the there was no nexus between the criminal activity and the location to be searched. (See Deft's Mem. in Support of Motion for Franks Hearing [Doc. #42] at 6-20.)

3. <u>Ineffective Assistance re: Sentencing Matters  (Grounds 2 and 3)</u>

Snead further claims that his counsel was ineffective in  failing to object to the PSR; and  failing to appeal sentencing disparity between his sentence and the sentence of his co-defendants.  The claims are meritless.  Snead does not say what objections his counsel could have been made to the PSR, nor does he make any showing that such objections would have been successful.  To the extent that Snead argues that his attorney should have objected to disparity in the sentences imposed on him and his other co-defendants, the argument is without force.  Snead was sentenced on January 29, 2010 –  well before any of his co-defendants and earlier than Silva.  Accordingly, his attorney could not have known what sentences his co-defendants would receive.[14]

From the record, including the evidence set forth in the PSR, it is clear that Snead was a leader, if not *the* leader, of this conspiracy.  Snead's leadership role, extensive criminal history (Criminal History Category VI), and belated acceptance of responsibility properly differentiated him from his co-defendants.  Thus, these claims fail.

4. <u>Other Ineffective Assistance Claims   (Grounds 5-6)</u>

---

[14]    Gonzalez was sentenced on March 2, 2010, to a term of 45 months imprisonment. This sentence reflected Gonzalez's acceptance of responsibility, willingness to testify at trial, and lesser role in the offense.  Danzot was also sentenced on March 2, 2010. She was sentenced to 39 months imprisonment.  Again, the sentence reflected Danzot's early acceptance of responsibility, willingness to testify at trial, and lesser role in the offense.  Finally, Monroe, who was only charged on one count of the Indictment, was sentenced on March 18, 2010, to a term of imprisonment of 12 months and a day. Monroe did not have a criminal history; his role in the offense was minor as compared with that of the co-defendants; his age was taken into account by the Court; and he was not charged with aggravated identity theft.  Finally, Silva was sentenced to a total term of 38 months imprisonment based on his violation of probation and conviction on an Information charging him with one count of conspiracy to commit credit card fraud and identity theft and two counts of unauthorized use of access device.  The Court sentenced Silva after full consideration of his own criminal conduct as well as his role in the investigation of Snead, Gonzalez, Danzot, and Monroe.

Snead's final two ineffective assistance claims warrant little discussion.[15]  His claim that counsel should have filed a motion seeking the undersigned's recusal due to the Court's supervision of the CI's probation, which somehow prejudiced Snead's case, is nonsensical on its face and devoid of support.  The fact that court regulations require law enforcement to obtain Court authorization if a person on supervised release is  actively assisting law enforcement agents in no way means the Court was involved in the investigation.  Indeed, Snead has shown no evidence that the Court was aware of the CI's activities in this matter other than through pleadings filed in connection with this case and with the CI's case.

Similarly, Snead's claim that counsel should have issued various subpoenas to clerks or employees at Las Vegas and Connecticut casinos in order to obtain potentially exculpatory information is without merit. First, the claim is arguably waived, in view of Snead's knowing and voluntary plea of guilty. During his change of plea hearing, Snead was advised of his right to compel the appearance of witnesses in his defense and to present evidence. Snead waived that right. Snead is not challenging the validity of his guilty plea.  Accordingly, there can be no prejudice here.  Furthermore, to the extent Snead argues that subpoenas should have been issued to these unidentified clerks in connection with the suppression hearing, there is likewise no prejudice because Snead was not entitled to an evidentiary hearing for the reasons already articulated above.

It follows that all of Snead's ineffective assistance claims are without merit.

B.    Prosecutorial Misconduct and Brady Violations

Finally, Snead claims that the Government committed prosecutorial misconduct in using perjured testimony and in failing to correct errors in its investigation.  As the Government points out, this claim is nothing more than another, last ditch effort to relitigate the suppression hearing.  Snead offers no

_____

[15]    As a preliminary matter, these claims may likewise be barred because Snead failed to raise them on direct appeal.  See Knight, 37 F.3d at 772.

specific allegations and no evidentiary support for his claims. Indeed, his claims are belied by the fact

that the government's pleadings in this case and the extensive discovery in this case provided Snead with

all the ammunition he uses in support of this motion. Snead has not pointed to any evidence– that was

not provided to him in discovery and which was in the government's possession – in support of his claim.

Furthermore, insofar as Snead chose to plead guilty, and did not file a direct appeal, these claims

too, are waived. Coleman v. Thompson, 501 U.S. 722, 750 (1991) (failure to raise a constitutional issue

on direct appeal, such as a Fourth Amendment claim, will bar raising the issue on collateral attack unless

the Petitioner can demonstrate cause and prejudice).

Finally, this Court notes that, in the instant motion to vacate, Snead appears intent on disparaging

the credibility of the CI.[16] The CI was a close associate of Snead; a person on whom Snead relied

extensively during the criminal scheme. Whatever the CI's failings, however, the independent evidence

collected by the Secret Service prior to the execution of the search warrant and afterwards leaves no doubt

as to Snead's guilt.

C.      Motion to Amend

Snead has also filed a motion for leave to amend his motion to vacate (Doc. #119), seeking to

assert a new claim. However, the proposed new claim is nothing more than a renewed attack on the

search warrant application and the constitutionality of the search of the Arch Street residence, the

---

[16]   In his Memorandum in Support of his motion to vacate, Snead unambiguously states the reason behind the instant Motion:

> Petitioner notes for the court, that he is not challenging his plea of guilty. Petitioner is only concern [sic] with the denial of his Suppression Hearing and Franks Hearing as petitioner had been denied an opportunity to prove the extent of the Government's wrongdoing.

Pet. Mem. at 7-8. The Government interprets this to show that Snead's primary motivation in filing the instant §2255 motion is to "get even" with the CI, and to disparage the Secret Service, the Government, and the Court. This Court need not comment on this observation but does conclude that the claims raised herein are all meritless.

sufficiency of which has been discussed <u>supra</u>.  This Court has already found that even if the errors

pointed out by counsel were accepted, the remaining evidence was more than sufficient to justify the

issuance of the search warrant for Snead's two locations.

Furthermore, permitting the new claim to proceed would likely be futile in any event, given that

Snead's guilty plea would preclude any consideration of the constitutionality of the search.  <u>See</u> <u>Cordero</u>,

42 F.3d at 698 (unconditional guilty plea precludes challenge to search warrant).

Moreover, to the extent that the proposed substantive claim itself lacks merit, any ineffective

assistance claims based on that point would fail as well.  <u>See</u> <u>Tse v. United States</u>, 290 F.3d 462, 465 (1st

Cir. 2002) (where substantive § 2255 claims fail on merits, "related claims that counsel rendered

ineffective assistance in failing to press claims at trial or on appeal must also fail.")

For all of these reasons, Snead's motion to amend and accompanying request for an evidentiary

hearing must be denied.

This Court has considered all of Snead's other arguments and finds them to be without

merit.

<u>CONCLUSION</u>

In view of the foregoing considerations, Snead's motion to vacate pursuant to 28 U.S.C. §2255

is hereby DENIED and dismissed.  In addition, Snead's motion to amend and his accompanying request

for an evidentiary hearing are likewise DENIED.[17]

---

[17]    In connection with his §2255 motion, Snead has also filed a motion to compel production of
exculpatory evidence, seeking investigative notes and statements in an effort to obtain impeachment
material relating to the CI (Doc. #108) and a motion to compel production of grand jury material, seeking
the grand jury testimony of Agent O'Brien and the CI (Doc. #109).  In view of this Court's disposition of
Snead's §2255 motion, both motions are denied as moot.  Those motions are precluded in any event by
Snead's guilty plea.  <u>See e.g.</u> <u>United States v. Gaffney</u>, 469 F.3d 211, 215 and n. 2 (1st Cir. 2006) (noting
that "an unconditional guilty plea effectuates a waiver of any and all independent non-jurisdictional
lapses that may have marred the case's progress up to that point....," including discovery errors).

## RULING ON CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings in the United States District Courts (§ 2255 Rules), this Court hereby finds that this case is <u>not</u> appropriate for the issuance of a certificate of appealability (COA), because Snead has failed to make a substantial showing of the denial of a constitutional right as to any claim, as required by 28 U.S.C. §2253(c)(2).

Snead  is advised that any motion to reconsider this ruling will not extend the time to file a notice of appeal in this matter.  <u>See</u>  § 2255 Rule 11(a).

SO  ORDERED:

<u>/s/ Mary M. Lisi</u>
Mary M. Lisi
Chief United States District Judge

Date: August 1, 2012